IN THE UNITED STATES DISTRICT COURT
DISTRICT OF KANSAS

| | | |
|---|---|---|
| PAGE ST. CLAIR | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. |
| | ) | |
| | ) | |
| DELUXE CORPORATION | ) | REQUEST FOR JURY TRIAL |
| | ) | |
| Defendant. | ) | |

## COMPLAINT FOR DAMAGES

COMES NOW Plaintiff Page St. Clair ("Plaintiff") and for their Complaint for Damages against Defendant Deluxe Corporation, ("Defendant"), alleges and states as follows:

### Parties and Jurisdiction

1. Plaintiff is a citizen of the United States, residing in Lenexa, Johnson County, Kansas, and at all times pertinent to this Complaint for Damages was an "employee" of Defendant within the meaning of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e(f) et seq. ("Title VII").

2. Defendant is a Minnesota corporation registered in the State of Minnesota and employing at least 15 employees within the United States.

3. Defendant continuously operates offices located at 15505 W. 113th Street, Lenexa, Johnson County, Kansas 66219.

4. Defendant was at all times pertinent to this Complaint for Damages, an "employer" within the meaning of the Title VII, 42 U.S.C. § 2000e(b).

5. This Complaint is brought under Title VII, a federal statute.

6. Some, if not all, of the alleged unlawful employment practices took place in the State of Kansas, within the territory of the District of Kansas.

1

7. Jurisdiction and venue are proper in the District of Kansas pursuant to 28 U.S.C. § 1331 and 28 U.S.C. §1391.

## Administrative Procedure and Procedural Posture

8. On or about May 28, 2020, Plaintiff timely filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") alleging Defendant discriminated against her on the basis of Plaintiff's sex and retaliated against her for making complaints of discrimination with Defendant Company.

9. Plaintiff subsequently filed an Amended Charge of Discrimination adding additional charges related to Defendant's retaliation in or about June 2020.

10. On or about January 26, 2021, the EEOC issued to Plaintiff her Notice of Right to Sue (attached as Exhibit A and incorporated herein by reference).

11. Plaintiff's Complaint is filed within ninety (90) days of the issuance of the EEOC's Notice of Right to Sue.

12. The aforesaid Charge of Discrimination provided the EEOC sufficient opportunity to investigate the full scope of the controversy between the parties and, accordingly, the sweep of this judicial complaint may be and is as broad as the scope of an EEOC investigation, which could reasonably be expected to have grown out of the Charge of Discrimination.

13. Plaintiff has satisfied all private, administrative and judicial prerequisites to the institution of this action.

## General Allegations Common to All Counts

14. Plaintiff was an employee of Defendant from in or about September 2016 until on or about July 10, 2020.

15. Plaintiff was employed by Defendant as a customer service representative.

16. Plaintiff was born a biological female, however, identifies as a non-binary person, meaning a person who identifies as neither specifically male nor female; they may identify as neither or both.

17. Plaintiff is a member of the protected classes of sex.

18. Plaintiff was subjected to disparate treatment than other employees because of her sex and gender identity.

19. Plaintiff was subjected to constant derogatory remarks, personal attacks, and harassment by their coworkers and managers because of their sex and because of their gender identity after coming out to their supervisor as a non-binary individual.

20. Plaintiff's employment was ultimately terminated by Defendant because of Plaintiff's sex and because of their gender identity, and in retaliation for making internal complaints of sex discrimination while employed by Defendant.

21. In or about November 2019, Plaintiff came out at work as a non-binary person and began asking their coworkers and bosses to use gender neutral pronouns when referring to Plaintiff.

22. Plaintiff explained to coworkers and bosses that using the pronouns "they/them/their" felt more natural to Plaintiff.

23. On or about November 15, 2019 Plaintiff told one of their male immediate bosses that they would like him and their coworkers to begin using gender neutral pronouns when referring to Plaintiff in the workplace.

24. The male supervisor agreed to do so and informed Plaintiff it would not be a problem.

25. On or about November 19, 2019, Plaintiff had a conversation with her next level manager, Jackie Thomas-Wright, who was directly above the male boss.

26. Thomas-Wright informed Plaintiff she would not approve of Plaintiff's request to use gender neutral pronouns.

27. Thomas-Wright informed Plaintiff she refused to use the gender neutral pronouns of "they/them/their" to refer to Plaintiff because they were "plural" in meaning.

28. Thomas-Wright further told Plaintiff that Plaintiff was female, and that using gender neutral pronouns would be incorrect.

29. Thomas-Wright further ordered Plaintiff to keep their gender to themselves and additionally told Plaintiff she could not be offended if someone refused to use Plaintiff's preferred pronouns.

30. Thomas-Wright then directed Plaintiff not to ask anyone else to use Plaintiff's preferred pronouns in referring to "her," and stated as the reason that Plaintiff's choice is "private" and not to be shared with coworkers.

31. Thomas-Wright additionally told Plaintiff to look up the words they/them/their in the dictionary.

32. On or about November 21, 2019 Plaintiff made a formal complaint of sex discrimination with Human Resources about Thomas-Wright's conduct towards Plaintiff because of their sex and gender identity.

33. A Human Resources Representative told Plaintiff that Thomas-Wright should respect Plaintiff's pronoun choices and that they would talk to Thomas-Wright and get back to Plaintiff.

34. Plaintiff never heard anything further from Human Resources regarding their complaint.

35. On or about November 22, 2019, Thomas-Wright behaved in a surly and openly disapproving manner towards Plaintiff at work, displaying her open disapproval through facial expressions and voice tone that expressed disdain for Plaintiff when communicating with Plaintiff.

36. On or about November 30, 2019, Thomas-Wright gave Plaintiff their annual review.

37. During the annual review meeting Thomas-Wright repeatedly referred to Plaintiff as "ma'am," hyper accentuating the word "ma'am" every time she referred to Plaintiff.

38. During the annual review meeting Thomas-Wright further persisted in her insistence that Plaintiff comport with female stereotypes and use female pronouns.

39. Thomas-Wright's conduct made Plaintiff extremely uncomfortable.

40. Plaintiff restated their preference to Thomas-Wright that they prefer Thomas-Wright refer to Plaintiff using gender neutral pronouns or by their name.

41. On or about December 6, 2019, another manager looked Plaintiff straight in the eye and pointedly referred to Plaintiff as "ma'am."

42. Plaintiff asked this manager to use either gender neutral pronouns or Plaintiff's name when referring to Plaintiff.

43. The manager refused.

44. On or about two days prior to December 6, 2019, Plaintiff sent a general email to coworkers notifying them Plaintiff had placed some sanitary pads in the women's restroom for anyone who might need one in an emergency to use.

45. Thomas-Wright then accused Plaintiff of engaging in "offensive conduct" for sending the email.

46. Upon information and belief, Thomas-Wright took offense to Plaintiff's email because of Plaintiff's sex and because they identify as a non-binary person, and in retaliation for Plaintiff's formal complaint about Thomas-Wright to Human Resources.

47. Upon information and belief, Thomas-Wright would not have taken offense to Plaintiff's email if Plaintiff identified as a stereotypical woman and if Plaintiff had not made a formal complaint against Thomas-Wright.

48. On or about December 19, 2019, Plaintiff noticed two women acting strangely towards Plaintiff.

49. The women were speaking but became quiet when they saw Plaintiff.

50. Further, the women's demeanor changed when they interacted with Plaintiff.

51. Upon information and belief, Thomas-Wright shared information about Plaintiff's complaint with Plaintiff's coworkers, causing the coworkers to gossip about Plaintiff.

52. On or about February 5, 2020, Plaintiff approached one of their coworkers who had continued to use female pronouns when referring to Plaintiff despite Plaintiff's requests the coworker use gender neutral pronouns.

53. The coworker became aggressive and told Plaintiff she would refer to Plaintiff based on what is in Plaintiff's pants.

54. On or about March 24, 2020, Plaintiff spoke to yet another coworker who had been using female pronouns to refer to Plaintiff about using gender neutral pronouns.

55. Plaintiff had never previously spoken to this coworker about her preference for gender neutral pronouns.

56. The coworker responded by taking offense to Plaintiff and acting like Plaintiff was accusing the coworker of talking behind Plaintiff's back.

57. The coworker further stated she knew all about Plaintiff's pronouns and that Plaintiff's manager had told her not to use them.

58. The coworker additionally told Plaintiff, "Since the manager won't use them it's a given I will use the 'right' ones," meaning female pronouns.

59. In or about early 2020, Plaintiff was removed from the Engagement Committee without her consent after coming out as non-binary and expressing a preference for gender neutral pronouns.

60. The Engagement Committee was a workplace social committee responsible for planning events such as birthdays or retirement parties to celebrate employees, and was not a duty related to job performance.

61. In or about March/April 2020 Plaintiff's manager further accused Plaintiff of solicitation of their coworkers when Plaintiff offered to facilitate the purchase of protective masks for coworkers at the beginning of the COVID-19 Pandemic.

62. Upon information and belief, Plaintiff was removed from the Engagement Committee and accused of solicitation because of their sex and because of their gender identity; Plaintiff would not have been treated this way but for their sex and gender identity.

63. Defendant has ignored its no solicitation policy for stereotypical women offering Girl Scout cookies and other fund raising items for sale in the office, but accused Plaintiff of violating the policy because of Plaintiff's gender identity and because she had previously made a formal complaint of sex discrimination against Thomas-Wright.

64. On or about May 7, 2020, Plaintiff contacted Human Resources to make another complaint because of the ongoing discrimination to which they had been subjected.

65. Plaintiff spoke with Kathleen Trump, who immediately quipped, "Didn't we already go over this?"

66. Plaintiff proceeded to inform Trump that they believed nothing had been done with their first complaint and that things had only gotten worse since the first complaint.

67. Trump then proceeded to "flip" the complaint onto Plaintiff by asserting Plaintiff had violated Defendant's solicitation policy.

68. Trump further blew off Plaintiff's complaints by claiming their concerns had all occurred "last year" and had been "taken care of."

69. Plaintiff again brought up Thomas-Wright's refusal to use Plaintiff's preferred pronouns, to which Trump responded, "Well, she's going based off your name like she said. We've already discussed that with Dale and Jackie."

70. Upon information and belief, "Dale" is Thomas-Wright's supervisor, and "Jackie" is Thomas-Wright.

71. Trump completely ignored Plaintiff's second attempt to make a formal complaint and was unphased by Plaintiff's report that Thomas-Wright had ordered Plaintiff to keep "her" gender to "herself."

72. Additionally, on or about May 7, 2020, Plaintiff received an email form Kelvin Wallace.

73. The email was titled "May Evaluation Scorecard."

74. Plaintiff was forwarded a report which was alleged to be their May customer service review with review of a customer call.

75. Plaintiff was downgraded to a 67.50% rating, whereas normally she received ratings between 91% and 100%.

76. On or about May 29, 2020, Plaintiff was forwarded the same report a second time by Kelvin Wallace containing the exact same review and customer call, allegedly for a new occurrence.

77. Upon information and belief, Defendant downgraded Plaintiff's performance because she complained of sex discrimination.

78. In or about June 2020 Plaintiff was informed that their position was being eliminated and their last day of employment was July 10, 2020.

79. As a result of enduring the aforementioned discrimination and retaliation, Plaintiff often cried at their desk and wished they were dead.

80. Plaintiff further felt hopeless and depressed as a result of Defendant's discrimination and retaliation against them.

81. Throughout Plaintiff's employment with Defendant, Plaintiff's coworkers and supervisor were openly permitted to make derogatory remarks about Plaintiff's sex and gender identity without punishment or correction.

82. Defendant, through its employees, further engaged in a pattern of gossip about Plaintiff, ordered Plaintiff's coworkers not to use Plaintiff's preferred pronouns, and further ordered Plaintiff's coworkers not to accept Plaintiff's gender identity.

83. When Plaintiff complained about the discrimination they were shunned, further discriminated against, were removed from a committee, and further accused of poor performance and violating company policy.

84. Plaintiff has been discriminated against in her employment by Defendant because of her sex and gender identity and has been retaliated against by Defendant for making complaints of illegal discrimination.

85. Defendant's reasons for terminating Plaintiff's employment were pretext for Defendant's discrimination against Plaintiff because of her sex and gender identity.

## COUNT I – VIOLATION OF TITLE VII - SEX DISCRIMINATION

86. Plaintiff hereby re-alleges and incorporates by reference the allegations contained in Paragraphs 1 through 85 above.

87. Plaintiff was born female, though their stated gender identity is non-binary, and is therefore a member of the protected class of "sex."

88. Plaintiff was subjected to sex discrimination at the hands of Defendant and/or Defendant's agents and subordinates, in that Defendant permitted Plaintiff's coworkers and supervisors to treat Plaintiff differently than they treated other employees because of their sex and gender identity.

89. Plaintiff reported the discriminatory practices to Defendant, and Defendant (through its agents, other employees, managers, and supervisors) made no attempt to remedy the situation, but rather ignored Plaintiff's complaints and eventually took disciplinary action against Plaintiff for making complaints.

90. Plaintiff's sex and gender identity was the reason they were treated differently than their coworkers who identified with female gender stereotypes.

91. Defendant's discrimination against Plaintiff directly and materially affected a term, condition, or privilege of Plaintiff's employment in that she was denied social opportunities in the workplace, sabotaged in the performance of her job, and was

subjected to harassment and beratement at the hands of her coworkers because of her sex and gender identity.

92. By not taking action to stop or rectify the disparate treatment, harassment, and sabotage, Defendant ratified, authorized and/or condoned the conduct of its agents and employees.

93. Defendant knew of the discrimination and failed to take appropriate action, or any remedial action whatsoever.

94. Plaintiff was ultimately discharged from their job because of their sex and gender identity.

95. As a direct and proximate result of Defendant's actions and/or omissions, Plaintiff has been deprived of income, as well as other monetary and non-monetary benefits.

96. As a further direct and proximate result of Defendant's actions and/or omissions, Plaintiff has suffered a loss of self-esteem, humiliation, emotional distress, mental anguish, pain and suffering, and related compensatory damages.

97. By failing to take prompt and effective remedial action, Defendant in effect condoned, ratified, and/or authorized the discrimination against Plaintiff.

98. As shown by the foregoing, Defendant's conduct was willful, wanton, and malicious, and showed complete indifference to or conscious disregard for the rights of others, including the rights of Plaintiff, thus, justifying an award of punitive damages in an amount sufficient to punish Defendant or to deter them and other companies from the conduct in the future.

WHEREFORE, Plaintiff requests that the Court enter judgment in Plaintiff's favor and against the Defendant for economic damages, including, but not limited to: back pay, lost benefits and front pay, injunctive relief, compensatory damages, punitive damages, for

reasonable attorney fees and costs incurred herein, for pre- and post-judgment interest as allowed by law, and for such other and further legal and equitable relief as this Court deems just and proper.

### COUNT II – VIOLATION OF TITLE VII - RETALIATION

99. Plaintiff hereby re-alleges and incorporates by reference the allegations contained in Paragraphs 1 through 99 above.

100. Plaintiff engaged in protected activity by making multiple complaints of sex discrimination within the workplace to employer.

101. Plaintiff was subjected to retaliation at the hands of Defendant and/or Defendant's agents and subordinates, in that Defendant permitted Plaintiff's coworkers to retaliate against Plaintiff and harass them because Plaintiff complained of the discrimination against Plaintiff, and Defendant either refused or failed to stop the retaliation and harassment.

102. Plaintiff complained of the retaliatory conduct to Defendant multiple times, and Defendant (through its agents, other employees, managers, and supervisors) made no attempt to remedy the situation, but rather ignored Plaintiff's complaints and eventually took disciplinary action against Plaintiff and terminated Plaintiff's employment for making complaints.

103. Plaintiff's complaints and protected activities were the reason the severe and pervasive harassment, and retaliation occurred.

104. Defendant's retaliation against Plaintiff directly and materially affected a term, condition, or privilege of Plaintiff's employment because the conditions were

continuous, outrageous, humiliating, and unreasonably interfered with Plaintiff's ability to perform the functions of their employment.

105. By taking actions against Plaintiff in retaliation for their complaints and protected activity, and by not taking action to stop Plaintiff's coworkers and supervisors from retaliating against and harassing Plaintiff, Defendant ratified, authorized and/or condoned the conduct of its agents and employees.

106. Defendant knew of the retaliation and failed to take appropriate action, or any remedial action whatsoever.

107. Plaintiff was ultimately discharged from their job in retaliation for making complaints of illegal discrimination.

108. As a direct and proximate result of Defendant's actions and/or omissions, Plaintiff has been deprived of income, as well as other monetary and non-monetary benefits.

109. As a further direct and proximate result of Defendant's actions and/or omissions, Plaintiff has suffered a loss of self-esteem, humiliation, emotional distress, mental anguish, pain and suffering, and related compensatory damages.

110. By failing to take prompt and effective remedial action, Defendant in effect condoned, ratified, and/or authorized the retaliation against Plaintiff.

111. As shown by the foregoing, Defendant's conduct was willful, wanton, and malicious, and showed complete indifference to or conscious disregard for the rights of others, including the rights of Plaintiff, thus, justifying an award of punitive damages in an amount sufficient to punish Defendant or to deter them and other companies from the conduct in the future.

WHEREFORE, Plaintiff requests that the Court enter judgment in their favor and against the Defendant for economic damages, including, but not limited to: back pay, lost benefits and front pay, injunctive relief, compensatory damages, punitive damages, for reasonable attorney fees and costs incurred herein, for pre- and post-judgment interest as allowed by law, and for such other and further legal and equitable relief as this Court deems just and proper.

### **Demand for Jury Trial and Designation of Place of Trial**

Plaintiff requests a trial by jury, in Kansas City, Kansas, on all counts and allegations of wrongful conduct alleged in this Complaint.

Respectfully Submitted,

LAW OFFICE OF MADELINE JOHNSON

/s/ *Madeline Johnson*
Mary Madeline Johnson, D. Kan. # 77985
220 Main Street, Suite 201
Platte City, Missouri 64079
Telephone: (816) 607-1836
Facsimile:  (816) 817-5507
Email: mmjohnsonlaw@gmail.com

ATTORNEY FOR PLAINTIFF